M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
Michelle Zhu SBN (SBN 347741)
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
12100 Wilshire Boulevard, Suite 800
Los Angeles, CA  90025
Tel: (916) 777-7777
*aberry@justice4you.com*
*gharoutunian@justice4you.com*
*mzhu@justice4you.com*

*Counsel for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASSIMILIANO FURLAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SAG-AFTRA HEALTH PLAN, <br><br> Defendant. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Massimiliano Furlan ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant SAG-AFTRA Health Plan ("Defendant" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

Class Action Complaint                    - 1 -

## NATURE OF THE ACTION

1.      This class action arises out of the recent data breach ("Data Breach") involving Defendant, which provides healthcare benefits to members of the Screen Actors Guild – American Federation of Television and Radio Artists labor union, the world's largest union of performers.

2.      Plaintiff brings this Complaint against Defendant for its failure to properly secure and safeguard the personally identifiable information that it collected and maintained as part of its regular business practices, including Plaintiff's and Class Members' names and Social Security numbers, (collectively defined herein as "PII") and information related to claims and health insurance information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

3.      Upon information and belief, current and former union members at Defendant's clients are required to entrust Defendant with sensitive, non-public Private Information, without which Defendant could not perform its regular business activities, in order to obtain employment or certain employment benefits at Defendant's clients. Defendant retains this information for at least many years, even after the relationship has ended.

4.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable

duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.    Defendant failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect union members' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

6.    In breaching its duties to properly safeguard union members' Private Information and give union members timely, adequate notice of the Data Breach's occurrence, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

7.    Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

Class Action Complaint                    - 3 -

8.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

9.      Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession

Class Action Complaint                          - 4 -

and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

10.    Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

11.    Plaintiff Massimiliano Furlan is a natural resident and citizen of Arleta, California.

12.    Defendant is a non-profit health care benefits company headquartered in California, at the principal address of 3601 West Olive Ave., Suite 300, Burbank, CA 91505.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff, is a citizen of a state different from Defendant.

14.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District, regularly conducts business in this District, and the

Class Action Complaint                    - 5 -

acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

15.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

### FACTUAL ALLEGATIONS

***Background of Defendant.***

16.    Defendant provides comprehensive healthcare benefits to members of the Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") labor union, the world's largest union of performers. The plan is governed by a board of 40 trustees, split evenly between union and producer representatives.[1]

17.    Plaintiff and Class Members are current and former union members of Defendant's clients.

18.    In order to apply to be a union member or obtain certain employment-related benefits at Defendant's clients, Plaintiff and Class Members were required to provide sensitive and confidential Private Information, including their names and Social Security numbers.

19.    The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

---

[1] SAG-AFTRA Health Plan, available at: https://www.sagaftraplans.org/health/about-us (last visited December 12, 2024).

Class Action Complaint                    - 6 -

20.    Upon information and belief, Defendant made promises and representations to its clients' union members, including Plaintiff and Class Members, that the Private Information collected from them as a condition of their employment would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

21.    Indeed, the first paragraph on Defendant's webpage of its privacy policy states: "[w]e respect and are committed to protecting your privacy. […] We pledge that we will take reasonable steps to ensure that your Personal Information and Usage Information."[2]

22.    Defendant further provides that: "[w]e maintain reasonable safeguards to keep your Personal Information secure."[3]

23.    Additionally, in Defendant's Notice of Privacy Practices, it also states that Defendant "is required by law to maintain the privacy" of its members' health information. Defendant further states that it "understands that your health information is personal," so it is "committed to protecting it."[4]

---

[2] SAG-AFTRA Health Plan, *Online Privacy*, available at: https://www.sagaftraplans.org/health/privacy (last visited December 12, 2024).

[3] *Id*.

[4] SAG-AFTRA Health Plan, *Notice of Privacy Notice*,  available at https://www.sagaftraplans.org/sites/default/files/inlinefiles/Notice%20of%20Privacy%20Practices%2001-2023%20%28from%20SPD%29.pdf (last visited on December 12, 2024).

24.     Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

25.     However, Defendant failed to even put in a reasonable amount of effort in implementing adequate and effective security measures to protect its network and the PII of Plaintiff and Class members. Specifically, Defendant's failure to train employees on cybersecurity and adequately safeguard employee accounts allowed criminals to exploit a phishing email targeting one of Defendant's employees.

26.     Moreover, Defendant did not implement basic security measures, such as preventing logins from unfamiliar locations, enforcing multi-factor authentication, or monitoring for unusual login activity. As a result, the breach occurred without any meaningful barriers or detection, exposing sensitive information that Defendant had pledged to protect.

27.     Defendant acknowledges that it "may collect or receive" individuals' sensitive PII in a variety of situations. [5]

28.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' PII, Defendant assumed legal and equitable duties and knew or should

---

[5] Online Privacy Policy, SAG-AFTRA Health Plan, available at: https://www.sag aftraplans.org/health/privacy (last accessed December 12, 2024).

have known it was responsible for protecting Plaintiff's and Class members' PII from disclosure.

29.    Because Defendant had a duty to protect Plaintiff's and Class members' PII, Defendant should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

30.    Plaintiff and Class members reasonably expect that benefits providers like Defendant will use the utmost care to keep their information confidential and secure, to use their information for business purposes only, and to make only authorized disclosures of their information.

31.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

32.    Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep its clients' union members' Private Information safe and confidential.

Class Action Complaint                - 9 -

33.    Defendant had obligations created by the FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

34.    Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

35.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

***The Data Breach.***

36.    On or about December 2, 2024, Defendant began sending Plaintiff and other victims of the Data Breach an untitled letter (the "Notice Letter"), informing them about the Data Breach. [6]

37.    The Letter is sparse on details, explaining only the following:

**What Happened**?

On September 18, 2024, we learned that an employee's email account had been compromised. The Plan immediately contained and remediated the issue, and with the assistance of leading third-

---

[6] *See* California Attorney General, A sample copy is available at https://oag.ca.gov/ecrime/databreach/reports/sb24-595543 (last visited on December 12, 2024).

Class Action Complaint                    - 10 -

party experts launched an investigation. The investigation determined that between September 17, 2024 and September 18, 2024, an unauthorized party accessed the contents of a single employee's email account. We also began analyzing the data that was compromised by the unauthorized third-party; this process is ongoing. On October 3, 2024, we discovered that the email account contained personal information related to some Plan participants. This incident resulted from a phishing email, and it is important to note that the Plan's systems were not impacted. We have also notified law enforcement about this event.

**What Information Was Involved?**

Our investigation determined that the email account contained emails and attachments used for administrative operations that included your name and Social Security number and may also have contained information associated with claims and health insurance information, such as your health plan participant identification number, if applicable.

**What We Are Doing**.

We take this matter very seriously. After detecting this unauthorized access, we took immediate steps to identify and contain this incident and will continue to implement and evaluate enhanced safeguards and security measures to further protect our systems and reduce the likelihood of a similar future event.[7]

---

[7] *Id.*

Class Action Complaint                    - 11 -

38.     In the Letter, Defendant stated: "SAG-AFTRA Health Plan (the Plan) is committed to protecting the privacy and security of the information in our care. "[8]

39.     Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

40.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

41.     Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and c) that once inside Defendant's networks and systems, the cybercriminals targeted information

---

[8] *Id.*

including Plaintiff's and Class Members' Social Security numbers, PHI, and other sensitive information, for download and theft.

42.     Despite learning about the Data Breach on September 18, 2024, Defendant did not report it to state authorities or notify affected individuals until around December 2, 2024 – nearly three months after the Data Breach occurred—delaying notification and preventing affected individuals from timely mitigating the consequences of the breach.

43.     As a result of this delayed notification, Plaintiff and Class members had no idea that their PII had been compromised and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm, including the sharing and detrimental use of their sensitive information. Because of the sensitive and immutable nature of the PII stolen, this risk will remain for their respective lifetimes.

44.     Moreover, in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

45.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for

Class Action Complaint                      - 13 -

Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

46.     The attacker targeted, accessed, and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class Members, including their names and Social Security numbers. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

47.     Plaintiff further believes that his Private Information and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

48.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to adequately protect the PII and to provide timely notification of the Data Breach.

49.     Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to implement adequate and reasonable measures to ensure that the PII of Plaintiff and Class members was safeguarded; failing to take reasonable steps to prevent unauthorized disclosure of data; failing to follow applicable, required, and appropriate protocols concerning data security; and failing to enact policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class members was stolen by criminals.

50.    Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

### Data Breaches Are Preventable.

51.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

52.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

53.    To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, union members and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and

---

[9] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited on December 12, 2024).

Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or

compression/decompression programs, including the AppData/LocalApp Data folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

54.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
-    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

---

[10] *Id.* at 3-4.

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[11]

55.    Given that Defendant were storing the sensitive Private Information of its clients' current and former union members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited on December 12, 2024).

Class Action Complaint            - 18 -

56.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of, upon information and belief, tens of thousands of individuals, including that of Plaintiff and Class Members.

### Defendant Acquires, Collects, and Stores Its Clients' Union Members' Private Information

57.     As a condition of employment with Defendant's clients, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendant.

58.     Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Defendant would be unable to perform its services.

59.     By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

60.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their

Class Action Complaint                - 19 -

Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

61.    Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

***Defendant Knew or Should Have Known of the Risk Because Union Benefit Providers in Possession of Private Information are Particularly Susceptible to Cyber Attacks.***

62.    Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

63.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information and other sensitive information, like Defendant, preceding the date of the breach.

64.    In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[12] Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry.[13] The

---

[12]    *See 2023 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf (last visited on December 12, 2024).
[13]    *Id.*

estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[14] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[15]

65.    In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

66.    Additionally, as companies became more dependent on computer systems to run their business,[16] *e.g*., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[17]

---

[14] *Id.*

[15] *Id*.

[16] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited on December 12, 2024).

[17] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited on December 12, 2024).

67.    As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

68.    Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

69.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

70.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to, upon information and belief, tens of thousands of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

71.    In the Notice Letter, Defendant makes an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other

unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' Private Information. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

72.    Defendant's offering of credit and identity monitoring establishes that Plaintiff and Class Members' sensitive Private Information *was*, in fact, affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

73.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

74.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

75.    As a union benefit provider in possession of its clients' union members' and former union members' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and

Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

### *Value of Personally Identifying Information.*

76.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, union benefit provider or taxpayer identification number."[19]

77.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20] For example, Personal Information

---

[18] 17 C.F.R. § 248.201 (2013).

[19] *Id.*

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*:
https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited on December 12, 2024).

Class Action Complaint                - 24 -

can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

78.    Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud, and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.[23]

79.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kinds of Private Information to be stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

---

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).
[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited on December 12, 2024).
[23] https://lifelock.norton.com/learn/identity-theft-resources/kinds-of-id-theft-using-social-security-number (last visited on December 12, 2024).

80.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [24] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[25]

81.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

---

[24] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited on December 12, 2024).

[25] *Id.*

[26] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

82.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[27] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[28]

83.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

84.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

---

[27]    *See*    https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social -security-number-identity-theft/ (last visited on December 12, 2024).

[28]    *See* https://www.investopedia.com/terms/s/ssn.asp (last visited on December 12, 2024).

[29]    Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft    (last visited on December 12, 2024).

85.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

86.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your

name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[30]

87.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[31]

88.     The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.*, patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the pharmaceutical industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

---

[30] *See* https://oag.ca.gov/idtheft/facts/your-ssn (last visited on December 12, 2024).

[31] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected (last visited on December 12, 2024).

89.     Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[32] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[33] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[34]

90.     According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[35]

91.     "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[36]

---

[32]      https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last visited on December 12, 2024).

[33]  https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited on December 12, 2024).

[34]  https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last visited on December 12, 2024).

[35] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited on December 12, 2024).

[36] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health

92.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[37] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[38]

93.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, PHI, and name.

94.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit

---

News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited on December 12, 2024).

[37] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited on December 12, 2024).

[38] *Id.*

card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[39]

95.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

96.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[40]

97.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is

---

[39] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited on December 12, 2024).

[40] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited on December 12, 2024).

incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### *Defendant Fails to Comply with FTC Guidelines.*

98.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

99.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal union member information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[41]

100.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[42]

---

[41] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on December 12, 2024).
[42] *Id.*

Class Action Complaint                    - 33 -

101.   The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

102.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect union member data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential union member data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

103.   These FTC enforcement actions include actions against union benefit providers, like Defendant.

104.   Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

105.   Defendant failed to properly implement basic data security practices.

106.   Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to its clients' union members' Private Information or to comply with applicable industry standards  constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

107.   Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its clients' union members, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**_Defendant Fails to Comply with Industry Standards._**

108.   As noted above, experts studying cybersecurity routinely identify union benefit providers in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information that they collect and maintain.

109.   Several best practices have been identified that, at a minimum, should be implemented by union benefit providers in possession of Private Information, like Defendant, including but not limited to: educating all union members; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which union members can access sensitive

Class Action Complaint                    - 35 -

data. Defendant failed to follow these industry's best practices, including a failure to implement multi-factor authentication.

110.   Other best cybersecurity practices that are standard for union benefit providers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

111.   Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

112.   These foregoing frameworks are existing and applicable industry standards for union benefit providers safeguarding their union members' data, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

Class Action Complaint                    - 36 -

***Common Injuries and Damages.***

113.   As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

***The Data Breach Increases Victims' Risk of Identity Theft.***

114.   The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

115.   Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without

Class Action Complaint                           - 37 -

the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

116.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

117.    Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

118.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[43]

---

[43] *See* N.C. Gen. Stat. § 132-1.10(1).

119. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[44]

120. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[45] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[46]

121. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[47]

---

[44] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers (last visited on December 12, 2024).

[45] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/ (last visited on December 12, 2024).

[46] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last visited on December 12, 2024).

[47] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in

122.  With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

123.  The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

124.  The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

---

various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited on December 12, 2024).

125.   Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

126.   Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud.*

127.   As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

128.   Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, changing passwords and resecuring their own computer networks, and signing up for credit monitoring insurance services. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

129.  Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[48]

130.  Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[49]

131.  And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

***Diminution of Value of Private Information.***

---

[48] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited on December 12, 2024).

[49] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited on December 12, 2024).

132.    Private Information is a valuable property right.[50] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

133.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[51]

134.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[52] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and

---

[50] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited on December 12, 2024).

[51] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[52] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited on December 12, 2024).

provides it to marketers or app developers.[53,54] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[55]

135.   As a result of the Data Breach, Plaintiff's and Class Members' Private Information , which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

136.   At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

137.   The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[53]   https://www.latimes.com/business/story/2019-11-05/column-data-brokers   (last visited on December 12, 2024).
[54] https://datacoup.com/ (last visited on December 12, 2024).
[55] Mike Brassfield, Nielsen Panel Will Pay You $50 to Share Your Internet History This Year, https://www.thepennyhoarder.com/make-money/nielsen-panel/(last visited on December 12, 2024).

138.   Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

139.   Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, upon information and belief, tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

140.   The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### *Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary.*

141.   Given the type of targeted attack, the sophisticated criminal activity, and the type of Private Information involved in this case, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

142. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's union benefit provider of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

143. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

144. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

***Loss of Benefit of the Bargain.***

145. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to obtain employment at Defendant's clients under certain terms, Plaintiff and other reasonable union members understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received employment positions of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients.

///

***Plaintiff Massimiliano Furlan's Experience.***

146.    Upon information and belief, Defendant obtained Plaintiff Furlan's Private Information in the course of conducting its regular business operations.

147.    Plaintiff Furlan is very careful about sharing his sensitive Private Information. Plaintiff Furlan stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

148.    Plaintiff Furlan's PII was entrusted to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

149.    Plaintiff Furlan would not have provided his PII to Defendant had he known that it would not undertake reasonable data security measures.

150.    At the time of the Data Breach—September 17, 2024 through September 18, 2024—Defendant retained Plaintiff's Private Information in its system.

151.    Plaintiff Furlan received the Notice Letter, by U.S. mail, directly from Defendant, dated December 2, 2024. According to the Notice Letter, Plaintiff Furlan's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, and health insurance information.

152.    Since the Data Breach, Plaintiff Furlan has experienced a significant increase in spam phone calls, texts, and/or emails.

153.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Furlan made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:  verifying the legitimacy of the Data Breach, researching the credit monitoring service provided by Defendant, blocking unsolicited spam communications, consulting attorneys, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

154.    Since learning of the Data Breach, Plaintiff Furlan has already spent two hours in one week on mitigation activities in response to the Data Breach—valuable time Plaintiff Furlan otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

155.    The Data Breach has caused Plaintiff Furlan to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence. Plaintiff Furlan is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

156.  Specifically, Plaintiff Furlan has experienced significant anxiety due to receiving fraudulent emails falsely claiming that he sold his cryptocurrency, despite no such transaction taking place.

157.  Subsequent to the Data Breach, Plaintiff Furlan has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

158.  As a result of the Data Breach, Plaintiff Furlan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

159.  As a result of the Data Breach, Plaintiff Furlan is at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

160.   Plaintiff Furlan has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### CLASS ACTION ALLEGATIONS

161.   Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

162.   The Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in December 2024 (the "Class").

163.   Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

164.   Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

Class Action Complaint                    - 50 -

165.   <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted.  The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

166.   <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.   Whether Defendant had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Defendant had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e.   Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct; and,

k.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

167. <u>Typicality.</u> Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

Class Action Complaint                    - 52 -

168.    <u>Policies Generally Applicable to the Class.</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

169.    <u>Adequacy.</u> Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

170.    <u>Superiority and Manageability.</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that hundreds of

Class Action Complaint                    - 53 -

individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

171.   The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

172.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

Class Action Complaint                           - 54 -

173.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

174.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

175.   Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

176.   Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

b.   Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.   Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard its clients' union members' Private Information; and,

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and All Class Members)**

177.  Plaintiff re-alleges and incorporates by reference all of the preceding allegations, as if fully set forth herein.

178.  Defendant requires its clients' union members, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing its services.

179.  Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its clients, which solicitations and services affect commerce.

180.  Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

181.   Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

182.   By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

183.   Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

184.   Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

185.   Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining employment at Defendant's clients.

Class Action Complaint                    - 57 -

186.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

187.   Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

188.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove former union members' Private Information it was no longer required to retain pursuant to regulations.

189.   Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

190.   Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

191.   Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.  Failing to adequately monitor the security of their networks and systems;

c.  Allowing unauthorized access to Class Members' Private Information;

d.  Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e.  Failing to remove former union members' Private Information it was no longer required to retain pursuant to regulations, and;

f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

192.  Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

193.  Defendant's violation of Section 5 of the FTC Act constitutes negligence.

194.  Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect, and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

Class Action Complaint                    - 59 -

195.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

196.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

197.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting union benefit providers in possession of Private Information.

198.   Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

199.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

Class Action Complaint                    - 60 -

200. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

201. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

202. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

203. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

204. Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

205. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

206.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

207.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

208.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm,

including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

209.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

210.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

211.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

212.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and All Class Members)**

213.    Plaintiff re-alleges and incorporates by reference all of the preceding allegations, as if fully set forth herein.

214.    Plaintiff and Class Members were required to submit their Private Information to Defendant as part of the process of obtaining employment-related

Class Action Complaint                    - 63 -

benefits at Defendant. Plaintiff and Class Members provided their payments and Private Information to Defendant with the assumption that a portion of its earnings would be used to adequately safeguard their Private Information and would not have obtained benefits at Defendant had they known that Defendant's data security practices were substandard.

215. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

216. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of performing its regular business operations.

217. Plaintiff and the Class entrusted their Private Information to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

218. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

219.   Implicit in the agreement between Plaintiff and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

220.   The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

221.   On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

222.   On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

223.   Plaintiff and Class Members provided their payments and Private Information to Defendant with the reasonable belief and expectation that Defendant

would use part of its earnings to obtain adequate data security. Defendant failed to do so.

224.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

225.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

226.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

227.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

228.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

229.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to

safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

230.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

231.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

232.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures;

(ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

233. Plaintiff re-alleges and incorporates by reference all of the preceding allegations, as if fully set forth herein.

234. This Count is pleaded in the alternative to the breach of implied contract (Count III).

235. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have had their Private Information protected with adequate data security.

236. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

237. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

238.   Defendant acquired the Private Information through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

239.   If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would have entrusted their Private Information at Defendant or obtained employment at Defendant's clients.

240.   Plaintiff and Class Members have no adequate remedy at law.

241.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

242.   Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

243.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i)

invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

244.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

245.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT IV
**Violation of California's Unfair Competition Law ("UCL")**
**Unlawful Business Practice**
**Cal Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of Plaintiff and All Class Members)**

246.    Plaintiff re-alleges and incorporates by reference all of the preceding allegations, as if fully set forth herein.

247.    Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

248.    Defendant violated Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

249.    Defendant's "unfair" acts and practices include:

a.    by utilizing cheaper, ineffective security measures and diverting those funds to its own profit, instead of providing a reasonable level of security that would have prevented the hacking incident;

b.    failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data;

c.    failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages;

d.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' personal information; and

e.    Omitting, suppressing, and concealing the material fact that it did

not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information.

250.   Defendant has engaged in "unlawful" business practices by violating multiple laws, including the FTC Act, 15 U.S.C. § 45, and California common law.

251.   Defendant's unlawful, unfair, and deceptive acts and practices include:

a.     Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' personal information, which was a direct and proximate cause of the Data Breach;

b.     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c.     Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.     Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining

reasonable security measures; and

    e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

252. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information.

253. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members' were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

254. Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

255. Plaintiff and Class Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

256. By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and Class Members.

257.   Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

258.   Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

### COUNT V
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code §§ 1798.100, *et. seq*. ("CCPA")**
**(On Behalf of the Plaintiff and All Class Members)**

259.   Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

260.   As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access and disclosure. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and

finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."

261.  As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendant failed to implement such procedures which resulted in the Data Breach.

262.  It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(c).

263.  Section 1798.150(a)(1) of the CCPA provides:

"Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for statutory or actual damages,

injunctive or declaratory relief, and any other relief the court deems proper."

264.   Plaintiff and Class Members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

265.   Defendant is a "business" as that term is defined in Cal. Civ. Code § 1798.140(d). Defendant is organized or operated for the profit or financial benefit of its shareholders or owners. Defendant collects consumers' personal information (including that of Plaintiff and the California Subclass) or such information is collected on Defendant's behalf, and Defendant determines the purposes and means of the processing of consumers' personal information. Defendant does business in California and has annual revenues well in excess of $25 million dollars.

266.   The information accessed during the Data Breach constitutes "personal information" as that term is defined in Cal. Civ. Code § 1798.140(v)(1). At a minimum, that information included full names, mailing addresses, Social Security numbers, and/or tax identification numbers.

267.   Under the CCPA, Defendant had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information that it stored. Cal. Civ. Code § 1798.150(a)(1).

268.   Defendant's failure to prevent the Data Breach by implementing and maintaining reasonable security procedures and practices constitutes a breach of its duty under the CCPA.

269.   As a result of the Data Breach, the nonencrypted and nonredacted personal information of Plaintiff and the Class Members was subject to unauthorized access and exfiltration, theft, or disclosures. The personal information accessed in the Data Breach was nonencrypted and nonredacted, as evidenced by the fact that Defendant was required to provide notification letters under the laws of several states that require notification of unauthorized access to nonencrypted and nonredacted information.

270.   On December 13, 2024, Plaintiff provided Defendant with written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). If Defendant fails to respond, or has not cured, or is unable to cure the violation within 30 days thereof, Plaintiff will amend this Complaint to seek all relief available under the CCPA, including damages to be measured as the greater of actual damages or statutory damages in an amount up to seven hundred and fifty dollars ($750) per consumer per incident.  See Cal. Civ. Code § 1798.150(a)(1)(A) & (b).

271.   As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks injunctive relief, including public injunctive relief, declaratory relief, and any other relief as deemed appropriate by the Court.

///

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless

Class Action Complaint                           - 78 -

Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

Vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things,

creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.      requiring Defendant to conduct regular database scanning and securing checks;

xi.     requiring Defendant to establish an information security training program that includes at least annual information security training for all union members, with additional training to be provided as appropriate based upon the union members' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.    requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its clients' union members' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing union members' compliance with Defendant's policies, programs, and systems for protecting personal identifying

information;

xiv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to

provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees and costs as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims so triable.


Dated: December 13, 2024          By: */s/ M. Anderson Berry*
                                      M. ANDERSON BERRY

                                      M. Anderson Berry (SBN 262879)
                                      Gregory Haroutunian (SBN 330263)
                                      Michelle Zhu (SBN 347741)
                                      **CLAYEO C. ARNOLD**
                                      **A PROFESSIONAL CORPORATION**
                                      12100 Wilshire Boulevard, Suite 800
                                      Los Angeles, CA 90025
                                      Tel: (916) 777-7777
                                      *aberry@justice4you.com*
                                      *gharoutunian@justice4you.com*
                                      *mzhu@justice4you.com*

                                      *Counsel for Plaintiff and the Proposed Class*